1
2
3
4
5
6
7

8           UNITED STATES DISTRICT COURT

9           NORTHERN DISTRICT OF CALIFORNIA

10                 San Francisco Division

11  BRENDAN MACMILLAN, et al.,          Case No. 21-cv-09159-LB

12              Plaintiffs,

13        v.                            **ORDER GRANTING IN PART AND
                                        DENYING IN PART MOTIONS TO
14  CITY AND COUNTY OF SAN              DISMISS**
    FRANCISCO, et al.,
15                                      Re: ECF No. 19
              Defendants.
16

17                     **INTRODUCTION**

18      The plaintiffs — Brendan and Melanie MacMillan and their children — allege that the City

19  and County of San Francisco (the CCSF) and several of its employees (Nicole Stein and Molly

20  Braun) violated their rights under the U.S. Constitution.[1] The claims arise from a November 2019

21  medical appointment after which a physician at the University of California, San Francisco

22  (UCSF) recommended that the MacMillans' sixteen-year-old daughter (plaintiff Margaret

23  MacMillan) be hospitalized due to weight loss, low heart rate, and missed periods.[2] Margaret and

24
25
26

---

27  [1] First Am. Compl. (FAC) – ECF No. 16 at ¶¶ 89–110. Citations refer to material in the Electronic
    Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

28  [2] *Id.* at ¶¶ 24–30.

ORDER – No. 21-cv-09159-LB

1  her parents, believing that the physician's recommendations were wrong and based on incorrect

2  information, declined hospitalization.[3]

3      The USCF physician contacted the CCSF to report possible child abuse.[4] The CCSF obtained a

4  warrant to take custody of Margaret and question her younger sister.[5] The plaintiffs successfully

5  moved to quash this warrant after having Margaret examined by non-UCSF physicians, who

6  believed Margaret was in good health.[6] The CCSF, however, obtained a second warrant and court

7  order authorizing officials to (1) photograph the purported injuries, (2) interview the MacMillans'

8  children outside the presence of their parents, and (3) arrange for the children to be medically

9  assessed by a child-abuse medical specialist.[7] Nicole Stein, an employee with the CCSF's

10  Department of Family and Children's Services, omitted the following from the warrant

11  applications: (1) the conflicting opinions of other physicians retained or consulted by the family

12  (the opinions of physicians who subsequently examined Margaret were omitted only from the

13  second warrant application); and (2) the explanations provided by Margaret and her parents for her

14  symptoms.[8]

15      Lt. Molly Braun, an investigator with the District Attorney's Office, also purportedly added

16  the plaintiffs to a missing-persons database.[9] This led to plaintiff Brendan MacMillan's brief

17  detention at Miami International Airport and a welfare check on the other members of the family

18  while on vacation in Massachusetts.[10]

19      The plaintiffs contend that the CCSF and its employees violated their rights under the Fourth

20  and Fourteenth Amendments to the U.S. Constitution.[11] The defendants moved to dismiss all

21

22  ─────────────────────
    [3] *Id.* at ¶¶ 26–29, 35–36.

23  [4] *Id.* at ¶ 37.

24  [5] *Id.* at ¶¶ 44–46.

    [6] *Id.* at ¶¶ 50–53, 66–67.

25  [7] *Id.* at ¶¶ 77–78.

26  [8] *Id.* at ¶¶ 44–46, 68–76.

27  [9] *Id.* at ¶¶ 2, 56.

    [10] *Id.* at ¶¶ 80, 82.

28  [11] *Id.* at ¶¶ 89–110.

United States District Court
Northern District of California

1   claims.[12] The court dismisses the Fourth Amendment claims brought by the plaintiffs Melanie,

2   Margaret, and L.M. with prejudice and dismisses the *Monell* claim (except on the failure-to-train

3   theory) without prejudice. There are no facts supporting independent Fourth Amendment claims by

4   any of these plaintiffs and they cannot assert derivative claims based on plaintiff Brendan

5   MacMillan's Fourth Amendment claim. Brendan's claim based on his detention on false

6   information at Miami International Airport is viable. The remaining claims survive primarily based

7   on Ms. Stein's material omissions in the warrant applications and Ms. Braun's — allegedly

8   unjustified — addition of the plaintiffs to a missing-persons database.

9

10                                      **STATEMENT**

11       On November 25, 2019, then-sixteen-year-old plaintiff Margaret MacMillan visited her

12   pediatrician, Sabrina Fernandez, M.D., at UCSF Benioff Children's Hospital with her mother

13   (plaintiff Melanie MacMillan) after experiencing irregular periods.[13] Because Margaret attended

14   boarding school in New Hampshire, Margaret's mother had scheduled the appointment during the

15   Thanksgiving holiday while Margaret was home in San Francisco.[14] During the appointment, Dr.

16   Fernandez noted that Margaret weighed 125 pounds but that, according to her UCSF records, she

17   weighed 142.9 pounds approximately five months earlier on June 12, 2019.[15] The plaintiffs assert

18   that the 142.9-pound weight recorded on June 12, 2019 was erroneous because, on July 13, 2019,

19   a chiropractor documented Margaret's weight at 132 pounds and because Margaret generally

20   weighed around 134 pounds.[16] Dr. Fernandez also noted a low resting heartrate of forty-eight beats

21   per minute during the November 25, 2019 appointment.[17]

22

23

24   _____

     [12] Mot. – ECF No. 19.

25   [13] FAC – ECF No. 16 at ¶ 12.

26   [14] *Id.* at ¶ 13.

     [15] *Id.* at ¶¶ 16, 20.

27   [16] *Id.* at ¶¶ 17, 19.

28   [17] *Id.* at ¶ 21.

Despite the apparent weight loss and low heart rate, Dr. Fernandez recorded that Margaret was an "alert, healthy-appearing patient in no acute distress."[18] While discussing the weight loss, Margaret told Dr. Fernandez that she had been endurance training six days a week and had just finished the cross-country (presumably running) season.[19] Nonetheless, Dr. Fernandez told Margaret's mother that she believed Margaret had an eating disorder and threatened to call Child Protective Services unless they agreed to see an eating-disorder specialist at UCSF.[20] The plaintiffs agreed and took Margaret to see Veronika Mesheriakova, M.D. the next day.[21]

On November 26, 2019, Dr. Mesheriakova recommended that Margaret's parents (plaintiffs Melanie and Brendan MacMillan) hospitalize her because her weight loss, low heart rate, and amenorrhea (missed periods) put her at risk for "sudden cardiac death."[22] Melanie and Brendan explained that the low heart rate was a product of endurance training and in line with their family history and that the purported weight loss was likely due to an error in Margaret's medical records.[23] The parents requested a referral to a cardiologist.[24] Dr. Mesheriakova refused and Melanie, Brendan, and Margaret declined hospitalization.[25]

Dr. Mesheriakova called the CCSF's Department of Family and Children's Services (the Department) and claimed that Margaret's parents were endangering her by refusing to hospitalize her.[26] Social worker Nicole Stein and her program manager Ronda Johnson contacted Margaret's parents.[27] Melanie and Brendan told Ms. Stein that (1) their daughter was healthy, (2) the reported weight loss was mostly due to errors in Margaret's medical record, (3) low heart rates are normal

---

[18] *Id.* at ¶ 20.

[19] *Id.*

[20] *Id.* at ¶¶ 21, 23.

[21] *Id.* at ¶ 24.

[22] *Id.* at ¶¶ 30, 37.

[23] *Id.* at ¶¶ 26–28.

[24] *Id.* at ¶ 33.

[25] *Id.* at ¶¶ 34, 36.

[26] *Id.* at ¶ 37.

[27] *Id.* at ¶¶ 38–39.

United States District Court
Northern District of California

for endurance athletes (and their family), and (4) they had discussed Margaret's health by phone with a cardiologist, who disagreed with Dr. Mesheriakova.[28] Margaret's parents also told Ms. Stein they were seeking a second opinion from a Stanford cardiologist and were monitoring their daughter closely.[29]

On November 27, 2019, Ms. Stein prepared a warrant seeking Margaret's removal from her parents' custody and her hospitalization.[30] The warrant application also requested a court order giving Ms. Stein permission to speak to Margaret's eleven-year-old sister, L.M., alone because Ms. Stein was "concerned about" her too.[31] Judge Monica Wiley on the San Francisco Superior Court approved the warrant application.[32] But Ms. Stein had omitted from the warrant application the following: (1) Margaret's parents' explanation for the purported weight loss (*i.e.*, that it was likely due to a clerical error), (2) Margaret's parents' explanation for the low heart rate based on their family history, (3) no cardiologist had examined Margaret, (4) Margaret's parents wanted her to be examined by a cardiologist, and (5) Margaret's parents had consulted with a cardiologist who disagreed with Dr. Mesheriakova's recommendation.[33]

In the meantime, the plaintiffs tried to have Margaret seen by a cardiologist at Stanford or another Bay Area cardiology practice.[34] The plaintiffs could not obtain an appointment at Stanford Hospital's Cardiology and Sports Cardiology Clinics.[35] The plaintiffs did not attempt to have Margaret seem by a cardiologist through Stanford's Emergency Department because Stanford purportedly advised that, based on her vitals and medical history, "it was not an emergency."[36]

---

[28] *Id.* at ¶¶ 39–41.

[29] *Id.* at ¶ 41.

[30] *Id.* at ¶ 44.

[31] *Id.*

[32] *Id.* at ¶ 46, 67.

[33] *Id.* at ¶ 45.

[34] *Id.* at ¶¶ 47–48.

[35] *Id.* at ¶ 49.

[36] *Id.* at ¶ 42.

Margaret's parents located Pediatric Cardiology Associates in San Antonio, Texas, who agreed to see Margaret on short notice with a pediatrician's referral.[37] The plaintiffs do not explain why they sought a physician in Texas rather than a physician closer to California. Nevertheless, on December 3, 2019, Margaret saw a pediatrician (apparently in Texas) and, on December 4, 2019, pediatric cardiologist Dr. Olawale Olabiyi examined Margaret.[38] Dr. Olabiyi performed an electrocardiogram (EKG) and an echocardiogram (ultrasound), determined that Margaret was in good health, and cleared her for "participat[ion] in all physical activities, including competitive sports."[39]

By December 5, 2019, the plaintiffs had retained counsel and, through counsel, provided all "relevant documentation" to the Department.[40] Then Ms. Braun, an investigator with the San Francisco District Attorney's Office, contacted the plaintiffs stating that she was investigating "a parental abduction case" and that she was concerned that Margaret was deceased.[41] The defendants (the complaint is unclear on exactly who) had also added the plaintiffs to a missing-persons database.[42] The complaint references a "federal" "MUPS" database but the MUPS acronym likely refers to the Missing and Unidentified Persons Section (MUPS) of the California Department of Justice. In any case, the plaintiffs submitted a video of their children to allay the Department's concerns and offered to have their children appear for a live video call.[43] The Department refused and demanded an in-person meeting.[44]

---

[37] *Id.* at ¶ 50.

[38] *Id.* at ¶¶ 51–53. It is not clear whether the reference to a "local pediatrician's office" in paragraph 51 of the FAC refers to an office in California or Texas.

[39] *Id.* at ¶ 53.

[40] *Id.* at ¶¶ 54–55.

[41] *Id.* at ¶¶ 55–58.

[42] *Id.* at ¶¶ 2, 56–59.

[43] *Id.* at ¶¶ 58–59.

[44] *Id.* at ¶ 61.

On December 12, 2019, plaintiff Brendan MacMillan moved to quash or recall the warrant, and, on December 19, 2019, Judge Wiley recalled the warrant.[45] But in the meantime, the Department had sought and obtained a warrant signed by Judge Rochelle East on December 18, 2019.[46] In the affidavit submitted for the December 18, 2019 warrant, Ms. Stein omitted information that a pediatrician and pediatric cardiologist had examined Margaret on December 3 and 4, 2019, respectively, and found her to be in good health.[47] The supporting affidavit also falsely asserted that Margaret's weight had dropped from a peak of 150 instead of 142 (the plaintiffs apparently rounded down from 142.9 pounds).[48] The December 18, 2019 warrant authorized "visually inspecting and photographing injuries, [and] entering the home and interviewing the children outside the presence of their parents."[49] On December 19, 2019, Judge East issued another order finding that the Department established good cause for a child-abuse medical specialist to assess the minor plaintiffs (Margaret and L.M.).[50]

Concerning the order for a medical examination of their children, the plaintiffs Brendan and Melanie consulted with a board-certified child-abuse pediatrician, but this physician was not a cardiologist and did not believe that "a medical assessment by him was medically indicated."[51] The minor plaintiffs Margaret and L.M. also did not want to consent to forensic sexual assault examinations.[52]

---

[45] *Id.* at ¶¶ 66–67.

[46] *Id.* at ¶¶ 68–69.

[47] *Id.* at ¶¶ 69–76.

[48] *Id.* at ¶ 76.

[49] *Id.* at ¶ 77.

[50] *Id.* at ¶ 78.

[51] *Id.* at ¶ 83.

[52] *Id.* at ¶ 84.

On December 26, 2019, officers from a local police department in Massachusetts visited Melanie, Margaret, and L.M. while they were in Massachusetts for Christmas.[53] Officers found everyone healthy and safe and, according to the plaintiffs, relayed their findings to Ms. Braun.[54]

Brendan was travelling out of the country when the police visited the rest of the family in Massachusetts, but was later detained, on December 28, 2019, when reentering the country through Miami International Airport based on "a missing persons case out of San Francisco."[55] Agents from "Customs and Border Control" (presumably United States Customs and Border Protection) held him for "hours," until Ms. Braun contacted the agents and presumably authorized his release.[56] The Agents told Brendan that he and "his family still showed up in the [missing-persons] database as 'missing.'" The warrants of December 18 and 19, 2019 remain in effect.[57]

The plaintiffs have asserted the following claims against the CCSF, Ms. Stein, and Ms. Braun, under 42 U.S.C. § 1983: (1) violating the Fourteenth Amendment by judicial deception (against Nicole Stein), (2) violating the Fourteenth Amendment by interfering with the right to travel (against Nicole Stein and Molly Braun), (3) violating the Fourteenth Amendment under *Monell* for unconstitutional policies or practices (against the CCSF), and (4) violating the Fourth Amendment by causing the seizure of plaintiff Brendan MacMillan (against Nicole Stein and Molly Braun).[58] The plaintiffs generally refer to interference with the right to familial association throughout the complaint, but did not assert such a claim.[59]

---

[53] *Id.* at ¶ 80.

[54] *Id.*

[55] *Id.* at ¶¶ 80, 82.

[56] *Id.*

[57] *Id.* at ¶¶ 78, 85.

[58] *Id.* at ¶¶ 89–110.

[59] *Id.* at ¶¶ 2, 43, 66, 85, 87.

United States District Court
Northern District of California

1    The CCSF and the individual defendants moved to dismiss all of the plaintiffs' claims.[60] The

2    parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c).[61] The court held a

3    hearing on May 5, 2022.

4

5                                    **LEGAL STANDARD**

6        A complaint must contain a "short and plain statement of the claim showing that the pleader is

7    entitled to relief" to give the defendant "fair notice" of what the claims are and the grounds upon

8    which they rest. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A

9    complaint does not need detailed factual allegations, but "a plaintiff's obligation to provide the

10   grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic

11   recitation" of the elements of a claim will not do. *Twombly*, 550 U.S. at 555 (cleaned up). "Factual

12   allegations must be enough to raise a right to relief above the speculative level." *Id.* (cleaned up).

13       To survive a motion to dismiss, a complaint must contain sufficient factual allegations, which

14   when accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556

15   U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that

16   allows the court to draw the reasonable inference that the defendant is liable for the misconduct

17   alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for

18   more than a sheer possibility that a defendant has acted unlawfully." *Id.* (cleaned up). "Where a

19   complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the

20   line between possibility and plausibility of 'entitlement to relief.'" *Id.* (cleaned up).

21       In determining whether to dismiss a complaint under Rule 12(b)(6), the court is ordinarily

22   limited to the face of the complaint. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980

23   (9th Cir. 2002). Factual allegations in the complaint must be taken as true and reasonable

24   inferences drawn from them must be construed in favor of the plaintiff. *Cahill v. Liberty Mut. Ins.*

25   *Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). The court cannot assume, however, that "the [plaintiff]

26

27   _____

     [60] Mot. – ECF No. 19.

28   [61] Consents – ECF Nos. 6, 14.

1    can prove facts that [he or she] has not alleged." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State*

2    *Council of Carpenters*, 459 U.S. 519, 526 (1983). "Nor is the court required to accept as true

3    allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable

4    inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). If a court

5    dismisses a complaint, it should give leave to amend unless the "pleading could not possibly be

6    cured by the allegation of other facts." *U.S. v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1182

7    (9th Cir. 2016) (cleaned up).

8

9                                              **ANALYSIS**

10        The plaintiffs' claims against the defendants all arise under 42 U.S.C. § 1983. Section 1983

11   provides a cause of action for the deprivation of "rights, privileges, or immunities secured by the

12   Constitution or laws of the United States" by any person acting "under color of any statute,

13   ordinance, regulation, custom, or usage." *Gomez v. Toledo*, 446 U.S. 635, 639 (1980). Section

14   1983 is not itself a source for substantive rights, but rather a method for vindicating federal rights

15   conferred elsewhere. *See Graham v. Connor*, 490 U.S. 386, 393–94 (1989).

16        To prevail on a § 1983 claim, the plaintiffs must demonstrate that a person acting under color

17   of state law deprived them of rights protected by the U.S. Constitution. *See Leer v. Murphy*, 844

18   F.2d 628, 632–33 (9th Cir. 1988). And to plead a § 1983 claim against the CCSF, the plaintiffs

19   must allege a policy or practice that caused the constitutional violation. *Monell v. Dep't of Soc.

20   Servs.*, 436 U.S. 658 (1978); *see, e.g.*, *Henderson v. Cnty. of Santa Cruz*, No. 14-cv-03544-RMW,

21   2015 WL 225429, at *6 (N.D. Cal. Jan. 16, 2015).

22        The parties do not dispute that the individual defendants acted under color of state law. The

23   issues are (1) whether the actions of the individual defendants violated the plaintiffs' rights under

24   the Fourteenth Amendment or the Fourth Amendment, (2) whether the claim against the city is

25

26

27

28

1    based on a policy or practice such that it constitutes a claim under *Monell*, and (3) whether the

2    individual defendant, Ms. Braun, is entitled to qualified immunity.[62]

3

4    **1. Fourteenth Amendment Judicial-Deception Claim**

5        "To support a § 1983 claim of judicial deception, a plaintiff must show that the defendant

6    deliberately or recklessly made false statements or omissions that were material to the finding of

7    probable cause." *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004) (citing *Galbraith v. Cnty. of*

8    *Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002)). The materiality of a false or omitted statement

9    is a question of law. *Bilbo v. Cnty. of Alameda, Cal.*, No. 17-cv-00932-JST, 2017 WL 4024649, at

10   *5 (N.D. Cal. Sept. 13, 2017) (citing *Butler v. Elle*, 281 F.3d 1014, 1024 (9th Cir. 2002)). A falsity

11   or omission in an affidavit supporting a warrant is material if a corrected affidavit would not

12   support probable cause. *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1084 (9th Cir. 2011).

13       Ms. Stein allegedly omitted the following from the November 27, 2019 warrant application:

14   (1) the explanations Margaret's parents provided for the purported weight loss and low heart rate;

15   (2) the parents' statements that they had consulted with a cardiologist who did not believe

16   Margaret had a concerning cardiac condition; and (3) the parents' intent to have Margaret

17   examined by a cardiologist.[63] These facts, especially the parent's stated intention to have Margaret

18   examined by a cardiologist, undermine the court's probable-cause findings because they

19   demonstrate that the parents were seeking a second opinion and not simply ignoring the UCSF

20   physician's advice. Then, when applying for another warrant on December 18, 2019, Ms. Stein

21   allegedly omitted documentation from the pediatrician and pediatric cardiologist who had

22   examined Margaret on December 3 and 4, 2019 and found her to be in good health.[64] The

23

24

25

---

26   [62] The defendant Ms. Stein has not moved to dismiss the claims against her based on qualified immunity.

27   [63] FAC – ECF No. 16 at ¶ 45.

28   [64] *Id.* at ¶¶ 69, 72

United States District Court
Northern District of California

1    plaintiffs' counsel sent this information to the Department on December 5, 2019 or approximately

2    two weeks before the December 18, 2019 warrant application.[65]

3          To explain these omissions, the defendants argue that the plaintiffs "fled the state in order to

4    find a cardiologist to examine Margaret, rather than wait a few hours in the emergency department

5    at Stanford."[66] While the complaint does not fully explain the plaintiffs' decision to see physicians

6    in Texas, the defendants do not claim that the Texas physicians who examined Margaret were not

7    appropriately licensed.[67] Therefore, the opinions of the Texas physicians were no less relevant to

8    Margaret's health than the opinions of the UCSF physicians. The plaintiffs' decision to obtain an

9    opinion from an out-of-state physician perhaps is unusual (a point that could have been addressed

10   in the warrant application), but it does not make that opinion immaterial.

11         The defendants also contend that "[a]n omission cannot be material if the omission itself is

12   based on information that contains further omissions of the Plaintiffs."[68] In this regard, the

13   defendants assert that the opinions of the Texas physicians were not material because they did not

14   have Margaret's "complete health history or concerns for anorexia that the UCSF physicians had

15   who recommended hospitalization."[69] The defendants do not cite any legal authority for the

16   proposition that an omission is not material if the omitted material itself contains omissions.

17   Furthermore, the argument is contrary to the alleged facts. Both of the Texas physicians examined

18   Margaret, performed tests (including weighing her and performing an EKG and an

19   echocardiogram), and "Margaret disclosed her recent spotting and missed menses to the

20   [pediatrician]."[70] The opinions of these physicians are material because they relate directly to the

21   central rationale for the warrants: that Margaret was in imminent danger and her parents were

22   refusing critical medical treatment.

23

24   ---

     [65] *Id.* at ¶¶ 54–55.

25   [66] Mot. – ECF No. 19 at 15.

26   [67] *Id.* at 15–16.

27   [68] *Id.* at 16.

     [69] *Id.* at 15–16.

28   [70] FAC – ECF No. 16 at ¶¶ 50–53.

The omission of the Texas physicians' opinions and the other facts (*i.e.*, explanations for Margaret's weight and heart rate and her parents' stated intention to have a cardiologist examine her) from the warrant applications are an adequate basis for a judicial-deception claim. It is plausible that a corrected warrant would not have supported probable cause. Thus, the plaintiffs have stated a claim for judicial deception against Ms. Stein.

### 2. Fourteenth Amendment Right-To-Travel Claim Against Ms. Stein and Ms. Braun

"The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment." *Kent v. Dulles*, 357 U.S. 116, 125 (1958). The right to travel protects the right to (1) "enter and to leave another State," (2) "be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State," and (3) "for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Saenz v. Roe*, 526 U.S. 489, 500 (1999).

For example, the Ninth Circuit has held that wrongful placement on the Transportation Security Administration's No Fly List can deprive a person of their right to travel by (1) "affect[ing] an individual's visa eligibility," (2) "lead[ing] to arrest and temporary incarceration," (3) "be[ing] considered in the probable cause inquiry of a bail determination[,]" and (4) having "international repercussions even if a listed person never tries to enter the United States, fly over U.S. airspace, or use a U.S. carrier." *Ibrahim v. U.S. Dep't of Homeland Sec.*, 912 F.3d 1147, 1179 n.31 (9th Cir. 2019). On the other hand, minor burdens do not violate the right to travel. For instance, "[b]urdens placed on travel generally, such as gasoline taxes, or minor burdens impacting interstate travel, such as toll roads, do not constitute a violation of [the fundamental right to interstate travel]." *Miller v. Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999).

The plaintiffs allege that they feared traveling between states given the outstanding warrants and their presence in a missing-person database.[71] The plaintiffs cite a visit from local law

---

[71] *Id.* at ¶¶ 65–66.

United States District Court
Northern District of California

1    enforcement in Massachusetts and plaintiff Brendan MacMillan's temporary detention in Miami.[72]

2    These allegations plausibly allege an infringement on the plaintiffs' right to travel.

3

4    **3.  Substantive Due Process**

5         While the plaintiffs' claims appear to be based primarily on procedural due-process violations,

6    the defendants have moved to dismiss the plaintiffs' claims to the extent they allege substantive

7    due-process violations. The Due Process Clause "forbids the government from depriving a person

8    of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with rights

9    implicit in the concept of ordered liberty.'" *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th

10   Cir. 1998) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)). "[T]he substantive

11   component of the Due Process Clause is violated by executive action only when it 'can properly

12   be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *Cnty. of*

13   *Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (quoting *Collins v. Harker Heights*, 503 U.S. 115,

14   128 (1992)). And "only the most egregious official conduct can be said to be 'arbitrary in the

15   constitutional sense.'" *Id.* at 846 (quoting *Collins*, 503 U.S. at 128). Even where the right is well

16   established, the "shocks the conscience" analysis determines whether the conduct amounts to a

17   violation of substantive due process. *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1079 (9th Cir.

18   2011) (applying the "shocks the conscience" analysis to the "well established" "right to family

19   integrity or to familial association").

20        Depending on the circumstances, the "shocks the conscience" standard can be satisfied by

21   showing either a "purpose to harm" or "deliberate indifference." *Porter v. Osborn*, 546 F.3d 1131,

22   1137 (9th Cir. 2008). Where "actual deliberation is practical" the applicable standard is "deliberate

23   indifference" but in urgent situations where deliberation is impractical (*e.g.*, highspeed chases and

24   prison riots), the "purpose to harm" standard applies. *Id.* at 1137–38 (citing *Lewis*, 523 U.S. at 852–

25   54).

26

27

28   _____

     [72] *Id.* at ¶¶ 80, 82.

United States District Court
Northern District of California

The applicable standard in this case is "deliberate indifference." The facts involve suspicion of child-abuse or neglect arising from the parents' decision not to hospitalize their outwardly healthy sixteen-year-old daughter after a routine medical visit. The authorities had time to deliberate on the best course of action after receiving a call from the teenager's physician. Arguing that the alleged conduct does not violate substantive due process as a matter of law, the defendants cite *Kulya v. City & Cnty. of San Francisco*.[73] No. C 06-06539 JSW, 2008 WL 4415116 (N.D. Cal. Sept. 26, 2008). That case is not helpful because it involved meaningfully different facts.

In *Kulya*, a six-year-old boy was taken from his father's custody after the boy told his mother (the father's ex-wife) and police officers that his father had hit him with a closed fist on multiple parts of his body. *Id.* at *1. Paramedics observed bruises and marks on the boy. *Id.* Social workers removed him from his father's custody. *Id.* After recanting his accusations, the boy was reunited with his father after approximately a week, and the father sued the social workers for violating his constitutional rights. *Id.* The *Kulya* court, citing the social workers' decision to err on the side of caution and their decision to return the boy "without waiting for the decision of the Family Court," held that they "did not act in a manner so intentional and offensive as to shock the conscience." *Id.* at *7.

The facts here are different. First, Margaret never wanted to be hospitalized, while the boy in *Kulya* initially asked for help.[74] Second, because Margaret was substantially older than the six-year-old boy in *Kulya*, she was presumably better able to make medical decisions for herself, and her opinion that she did not need hospitalization weighed against the Department's interference.[75] Third, the boy's claims of abuse in *Kulya* were corroborated by bruising, which paramedics confirmed, but here, other physicians disputed the UCSF physicians' concerns.[76] Furthermore,

---

[73] Mot. – ECF No. 19 at 20.

[74] FAC – ECF No. 16 at ¶ 36.

[75] *Id.* at ¶ 8 ("[Margaret] was 16 years old at the time of the incident described [in the complaint].").

[76] *Id.* at ¶ 53.

1     Margaret and her parents provided reasonable explanations for her apparent weight loss and low

2     heart rate.[77] In *Kulya*, there apparently were no explanations for the bruises until the boy recanted.

3         In sum, an entirely different set of facts confronted the social workers in *Kulya* than confronted

4     Ms. Stein and Ms. Braun. Therefore, the defendants have not established, based on *Kulya*, that

5     their alleged conduct does not "shock the conscience" as a matter of law. The plaintiffs' cases also

6     involve materially different facts.

7         The plaintiffs cite *Zion v. Cnty. of Orange*, where an officer shot at and then "stomped" on a

8     suspect's head.[78] 874 F.3d 1072, 1075 (9th Cir. 2017). The court, applying the heighted "purpose

9     to harm" standard, held that "a reasonable jury could also conclude that [the officer] was acting

10    out of anger or emotion rather than any legitimate law enforcement purpose" and reversed a

11    district court order granting summary judgment in favor of the officer. *Id.* at 1077. In *Zion*, the

12    alleged conduct (shooting at and stomping on a suspect) and the context (a police investigation of

13    a man who reportedly had a seizure and bit and cut his mother) are much different than the facts

14    here. *Id.* at 1075. The plaintiffs also cite *Mann v. Cnty. of San Diego*, but in that case the court

15    held that the "shocks the conscience" standard did not apply to a municipality's conduct on a

16    *Monell* claim and, therefore, did not apply it.[79] 907 F.3d 1154, 1163–64 (9th Cir. 2018) ("We

17    reject the County's argument that we must also apply a 'shocks the conscience' standard[.]").

18    Thus, the *Mann* decision is not helpful.

19        On balance, "fact issues surrounding responsibility and a sufficiently culpable mind [for

20    purposes of claims under the Fourteenth Amendment's Due Process Clause] are better addressed

21    at summary judgment." *Soria v. Cnty. of Alameda*, No. 18-cv-06168-LB, 2019 WL 1233747, at *3

22    (N.D. Cal. Mar. 16, 2019). Thus, the court cannot say at the pleading stage that the defendants'

23    alleged conduct (omitting facts from the warrant applications and adding the plaintiffs to a

---

[77] *Id.* at ¶¶ 26–28.

[78] Opp'n – ECF No. 22 at 22.

[79] Opp'n – ECF No. 22 at 22–23.

United States District Court
Northern District of California

missing-persons database) does not amount to deliberate indifference such that the court should dismiss the plaintiffs' Due Process Clause claims.

### 4. *Monell*

Because the § 1983 claim is against the CCSF, and not against an individual actor, the plaintiffs must allege a policy or custom that caused the due-process violation. *Monell*, 436 U.S. at 690–91. To impose *Monell* entity liability under § 1983 for a violation of constitutional rights, a plaintiff must show that (1) the plaintiff possessed a constitutional right and was deprived of that right, (2) the municipality had a policy, (3) the policy amounts to deliberate indifference to the plaintiff's constitutional right, and (4) the policy was the moving force behind the constitutional violation. *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997). A *Monell* claim can be based on any of the following theories: (1) a longstanding practice or custom, (2) the failure to adequately train, or (3) a constitutional violation committed or ratified by an official with final policy-making authority. *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249–50 (9th Cir. 2010), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).

Where a *Monell* claim is based on an allegedly unconstitutional policy, it is sufficient to allege policies that would cause the alleged constitutional violation. *Henderson*, 2015 WL 225429, at *6 ("[P]laintiffs have not pleaded sufficient facts to support the existence of such policies, but that evidence is not necessary at the motion to dismiss stage."). To maintain a *Monell* claim based on a failure-to-train theory, "the identified deficiency in a local governmental entity's training program must be closely related to the ultimate injury." *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001) (cleaned up). A policymaker theory requires showing that "final policymaking authority" was delegated to the purported policymaker. *Jessen v. Cnty. of Fresno*, 808 F. App'x 432, 435 (9th Cir. 2020). And a ratification theory requires alleging that the defendant approved the wrongful conduct. *Perryman v. City of Pittsburg*, 545 F. Supp. 3d 796, 803 (N.D. Cal. 2021) (citing *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004)).

The plaintiffs allege unconstitutional policies in unacceptably vague terms. For example, the plaintiffs cite "[t]hese policies and practices" where there is no preceding reference to any policy.[80] The plaintiffs also contend that the "lack of an adequate supervisorial response by Defendant City demonstrates the existence of an informal custom, policy, or practice, which tolerates and promotes the continued violation of civil rights."[81] These conclusory allegations are insufficient to allege a *Monell* violation under a policy or practice theory. *Cf. Henderson*, 2015 WL 225429, at *6 (finding that the plaintiffs adequately pleaded a *Monell* claim based on allegations describing specific policies concerning the release of prisoners with mental-health conditions).

Concerning a policymaker theory, the plaintiffs allege that Ms. Stein's "supervisor Ronda Johnson" knew about the significant discrepancies in the information put forth in the warrant application and that "high-ranking City officials" knew about the "unconstitutional interference."[82] This is insufficient to establish a *Monell* claim based on a policymaker theory because there is no allegation that those more senior individuals had final policymaking authority. *Jessen*, 808 F. App'x at 435.

The plaintiffs' failure-to-train theory fares better. The plaintiffs allege that "the City has failed to provide adequate training, or no training at all, on the obligations of City employees to include all material information in warrant applications, not execute stale warrants after probable cause has dissipated, conduct an independent investigation when presented with contradictory medical opinions . . . and to conduct themselves as professionals charged with not only ensuring the investigation of child welfare, but also the preservation of the family's fundamental rights."[83]

In *Kirkpatrick v. Cnty. of Washoe*, the Ninth Circuit affirmed a district court's denial of summary judgment on a *Monell* claim where the defendant municipality had a practice of "conducting warrantless seizures of children in non-exigent circumstances." 843 F.3d 784, 796–97

---

[80] FAC – ECF No. 16 at ¶ 99.

[81] *Id.* at ¶ 101.

[82] *Id.* at ¶¶ 60, 100.

[83] *Id.* at ¶ 102.

1   (9th Cir. 2016). The court cited testimony from social workers who stated that they could not recall

2   imminent-danger training or who would remove children even without a warrant or imminent

3   danger. *Id.* at 796 n.3. The court held that the need for the defendant to train its social workers "on

4   the constitutional limitations of separating parents and children is 'so obvious' that its failure to do

5   so is properly . . . characterized as 'deliberate indifference' to the constitutional rights of . . .

6   families." *Id.* at 796–97. The *Kirkpatrick* court also noted that the existence of a link between the

7   County's "policy of conducting warrantless seizures of children in non-exigent circumstances" and

8   the alleged warrantless removal of the plaintiff's child was a question of fact. *Id.* at 797.

9        The CCSF argues that the reasoning from *Kirkpatrick* does not apply because there the failure

10   to train "was coupled with the practice of removing children from parental custody without a

11   warrant and in non-exigent circumstances."[84] This is unpersuasive. Here, the failure to train is

12   "coupled" with the CCSF's alleged material omissions in warrant applications. A warrant obtained

13   by judicial deception is not meaningfully different than the absence of a warrant. Also, the CCSF's

14   argument that "omissions, of a single social worker, do[] not support a claim of a deliberate

15   indifference" contradicts the allegations — which must be taken as true at this stage — which

16   describe the involvement of multiple individuals in the CCSF's investigation.[85]

17        Given the plausible interference with rights of familial association, the plaintiffs' allegations,

18   while thin, establish a plausible *Monell* claim against the city based on a failure-to-train theory.

19

20   **5. Fourth Amendment**

21        "The Fourth Amendment prohibits unreasonable searches and seizures." *Espinosa v. City and*

22   *Cnty. of San Francisco*, 598 F.3d 528, 533 (9th Cir. 2010). The general rule is that "a person has

23   been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the

24   circumstances surrounding the incident, a reasonable person would have believed that he was not

25   free to leave." *U.S. v. McClendon*, 713 F.3d 1211, 1215 (9th Cir. 2013) (quoting *United States v.*

26

27   _____
     [84] Reply – ECF No. 23 at 2.

28   [85] Mot. – ECF No. 19 at 26.

United States District Court
Northern District of California

*Medenhall*, 446 U.S. 544, 554 (1980)). A seizure occurs only when the police terminate an individual's freedom of movement through means intentionally applied. *United States v. Al Nasser*, 555 F.3d 722, 728 (9th Cir. 2009) (citing *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596–97 (1988)). Fourth Amendment claims may not be derivative. *Alderman v. United States*, 394 U.S. 165, 174 (1969) (rights under the Fourth Amendment "may not be vicariously asserted"); *Moreland v. Las Vegas Met. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 2001) (same).

Plaintiff Brendan MacMillan's Fourth Amendment claim is based on his detention at Miami International Airport, but the other plaintiffs (Melanie, Margaret, and L.M.) do not cite any facts that could constitute a search or seizure.[86] They also appear to have consented to their interactions with local law enforcement in Massachusetts.[87] Accordingly, the defendants seek dismissal of the Fourth Amendment claims of the plaintiffs Melanie, Margaret, and L.M. because (1) their claims are derivative of Brendan's claim and (2) they have not alleged facts supporting any independent Fourth Amendment claims.[88] The plaintiffs did not oppose the dismissal of these apparently derivative Fourth Amendment claims or assert any additional facts that could potentially support independent claims.[89] The court, thus, dismisses the derivative Fourth Amendment claims of plaintiffs Melanie, Margaret, and L.M. with prejudice. *Alderman*, 394 U.S. at 174.

Regarding Brendan, his claim is based on his detention in Miami, which was allegedly caused by the defendants Ms. Stein and Ms. Braun by their adding him to and failing to remove him from a missing-persons database.[90] Brendan alleges that he was "detained" for "hours" by "federal agents" at Miami International Airport and that he was not "released" until the agents communicated with Ms. Braun.[91] These allegations plausibly establish that Brendan was "seized" under the Fourth Amendment because he did not believe he was free to leave the airport.

---

[86] FAC – ECF No. 16 at ¶¶ 108–109. (Notably, the plaintiffs fail to reallege and incorporate the prior allegations in the complaint to support the Fourth Amendment claim.)

[87] *Id.* at ¶ 80.

[88] Mot. – ECF No. 19 at 21–22.

[89] Opp'n – ECF No. 22 at 23.

[90] FAC – ECF No. 16 at ¶¶ 108–110.

[91] *Id.* at ¶ 82.

1       The defendants ask the court to dismiss Brendan's Fourth Amendment claim based on their

2   contention that there is no authority finding "that an unreasonable seizure occurs where the alleged

3   violators did not directly participate in the seizure."[92] The Supreme Court has stated, however, that

4   "[i]f police have been shown to be reckless in maintaining a warrant system, or to have knowingly

5   made false entries [in a warrant system] to lay the groundwork for future false arrests, exclusion

6   [for violating the Fourth Amendment] would certainly be justified under our cases should such

7   misconduct cause a Fourth Amendment violation." *Herring v. United States*, 555 U.S. 135, 146

8   (2009). In other words, making a false database entry that causes an unreasonable seizure may

9   violate the Fourth Amendment.

10      Furthermore, the Ninth Circuit has recognized that a person's presence on the "Endangered

11  Missing Adult in the National Missing Person Database" could prompt that person's arrest. *United*

12  *States v. Evans*, 445 F. App'x 29, 31 (9th Cir. 2011). Thus, the plaintiffs' allegations plausibly

13  establish that Ms. Stein and Ms. Braun should have known that adding the family to the database

14  could lead to their arrest. The plaintiffs also have alleged facts that could plausibly establish that

15  they were not "missing" such that they should have been placed or kept in the missing-persons

16  database. For instance, they communicated with the CCSF on November 26, 2019, their counsel

17  had been in communication with the CCSF since December 5, 2019, and two days before

18  Brendan's detention in Miami, local law enforcement had visited his family in Massachusetts.[93] In

19  sum, the allegations, if true, establish that Brendan was seized based on false information that Ms.

20  Stein and Ms. Braun placed in the missing-persons database. These facts support a plausible

21  Fourth Amendment claim.

22

23  **6.  Qualified Immunity**

24      "[T]he doctrine of qualified immunity protects government officials from liability for civil

25  damages insofar as their conduct does not violate clearly established statutory or constitutional

26

27  ───────────────

    [92] Mot. – ECF No. 19 at 21.

28  [93] FAC – ECF No. 16 at ¶¶ 38, 54, 80–82, 94–95.

United States District Court
Northern District of California

rights of which a reasonable person would have known." *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc) (cleaned up) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Qualified immunity is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mueller v. Auker*, 576 F.3d 979, 992 (9th Cir. 2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "Under qualified immunity, an officer will be protected from suit when he or she 'makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

"[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). "The doctrine of qualified immunity gives officials breathing room to make reasonable but mistaken judgments about open legal questions." *Id.* at 1866 (cleaned up). "[I]f a reasonable officer might not have known for certain that the conduct was unlawful[,] then the officer is immune from liability." *Id.* at 1867.

In determining whether an official is entitled to qualified immunity, courts consider (1) whether the official violated a constitutional right of the plaintiff and (2) whether that constitutional right was "clearly established in light of the specific context of the case" at the time of the events in question. *Mattos*, 661 F.3d at 440. Courts may exercise their sound discretion in deciding which of these two prongs should be addressed first. *Id.* (citing *Pearson*, 555 U.S. at 235).

Regarding the second prong, "clearly established law should not be defined at a high level of generality," but instead "must be particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (cleaned up). Although case law "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

The Ninth Circuit has held that deciding "claims of qualified immunity at the motion-to-dismiss stage raises special problems for legal decision making" because of the tension between the plausibility standard for pleading a claim and the "low bar" for establishing qualified immunity. *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018) (cleaned up). Consequently, at the motion to dismiss stage, "[i]f the operative complaint contains even one allegation of a harmful act

that would constitute a violation of a clearly established constitutional right, then plaintiffs are entitled to go forward with their claims." *Id.* at 1235.

Defendant Ms. Braun contends that she is entitled to qualified immunity on the plaintiffs' second (right to travel) and fourth (unreasonable seizure) claims.[94] The issue is whether adding the plaintiffs to the missing-persons database (right-to-travel claim) or failing to remove Brendan MacMillan from the missing-persons database within two days after local law enforcement officers assessed his daughters and wife, violated "a clearly established constitutional right." The defendants argue that they "are not aware of any controlling case holding that a Fourth or Fourteenth Amendment violation occurs from a short detention at an airport, because someone was not removed quickly enough from a missing persons database."[95] While not directly on point, the Ninth Circuit has recognized that a constitutional violation can arise from wrongful placement on the TSA's No Fly List. *Ibrahim*, 912 F.3d at 1179 n.31. Thus, "the statutory or constitutional question [is] beyond debate" (*Kisela v. Hughes*, 138 S. Ct. at 1152) and, at this stage of the litigation, Ms. Braun is not entitled to the dismissal of the claims against her based on qualified immunity.

## CONCLUSION

The court denies the motion to dismiss except as to the Fourth Amendment claims of plaintiffs Melanie, Margaret, and L.M., which are dismissed with prejudice, and two of the *Monell* theories, which are dismissed without prejudice. The plaintiffs may file an amended complaint within 28 days to cure the deficiencies on the two *Monell* theories. If they do, they must attach a blackline of the amended complaint against the current complaint.

This disposes of ECF No. 19.

**IT IS SO ORDERED.**

Dated: May 8, 2022

_____
LAUREL BEELER
United States Magistrate Judge

---

[94] Mot. – ECF No. 19 at 22–24.

[95] *Id.* at 24.